## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **WELLS FARGO BANK, NATIONAL ASSOCIATION on behalf of itself and as administrative agent and collateral agent for itself and Compass Bank, and COMPASS BANK,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **CASE NO. 1:10-CV-02286-TWT** |
| **DAVID BERKMAN, BTA FUND, LLC, ALAN J. TRAVIS, and KENNETH P. ALEXANDER,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

Plaintiffs Wells Fargo Bank, National Association ("Wells Fargo") and Compass Bank ("Compass") (together, the "Lenders") request a preliminary injunction to prevent Defendants or their agents from further transferring or otherwise disposing of the property fraudulently transferred to defendant BTA Fund, LLC ("BTA") to prevent the substantial harm to Plaintiffs that any additional transfer would cause.

# I. **INTRODUCTION**

Plaintiffs Wells Fargo and Compass merely seek to maintain the status quo by enjoining defendants David Berkman ("Berkman") and BTA from further transferring or otherwise disposing of $23,000,000 in cash or cash equivalents that are the subject of the Lenders' pending fraudulent transfer action until the case is resolved on the merits.

The Lenders are likely to prevail on the merits, and thus entitled to a preliminary injunction, because eight of the eleven statutory "badges of fraud" are present here, constituting conclusive evidence of a fraudulent transfer. Moreover, it is undisputed that Berkman transferred to BTA his interest in twenty bank accounts totaling $23,000,000 (collectively, the "Transferred Assets"). The transfer of these accounts was made with actual and constructive intent to defraud the Lenders and was, and is, an attempt to prevent Berkman's creditors from reaching those funds.

Berkman owes the Lenders amounts far in excess of the $23,000,000 comprising the Transferred Assets.[1] Thus, the Lenders will be irreparably harmed

---

[1] As shown below, (a) Berkman guaranteed the loan at issue in this case which has an outstanding balance in excess of $14,000,000, and (b) Berkman guaranteed another loan owed to Wells Fargo which has matured and has an outstanding balance in excess of $7,000,000. Further, there are numerous other loans owed to Wells Fargo and Compass that Berkman has guaranteed and that are in default.

if BTA further transfers those funds to third parties, against whom Lenders may have no recourse, prior to the resolution of this case on the merits.   Further, because the Lenders are only asking the Court to maintain the status quo, any purported harm to Berkman or BTA would be minimal, if any.   Thus, the balance of harms tilts strongly in the Lenders' favor.   Moreover, public policy clearly favors preventing harm caused by fraudulent transfers.

A preliminary injunction prohibiting the Defendants from transferring any portion of the $23,000,000 in Transferred Assets to any third party until final judgment has been entered is thus appropriate and necessary to prevent significant harm to Lenders.

## II.  STATEMENT OF FACTS

### A.    The Loan and the Guaranty

Berkman Plaza 2, LLC ("Berkman Plaza") owes Lenders in excess of $14,000,000 pursuant to the Loan Documents.[2]  (Am. Compl., ¶¶ 15-16, Exs. C, D & E.)  The Loan Documents required that the loan be repaid in full by January 16, 2011.  (Am. Compl., Ex. D at 15.)  Berkman is an equity holder in and the manager of Berkman Plaza and guaranteed the loan from Lenders to Berkman Plaza.  (Am.

---

[2] Capitalized terms not defined in this memorandum have the meaning given to them in the Lenders' First Amended Complaint.

Compl., ¶¶ 14 & 17, Exs. C & E.)   According to Berkman's own financial statement submitted in April 2010, he has guaranteed loans in excess of $200,000,000.  (Am. Compl., Ex. A (filed under seal).)

Section 6.4 of the Guaranty requires that Berkman "at all times maintain Liquid Assets of not less than $15,000,000."  (Am. Compl., ¶¶ 34-35, 37, Ex. E.)

## B.    The Notice of Default

By letter dated July 31, 2009, Wells Fargo notified defendant Alan J. Travis ("Travis") (as President of Berkman Plaza) that events of default existed under the Loan Documents and that the loan commitments were terminated (the "Default Letter").  (Am. Compl., ¶ 20, Ex. F.)  Wells Fargo also mailed a copy of the Default Letter to Berkman as guarantor of the loan.  (Am. Compl., ¶ 20, Ex. F.)

## C.    BTA is Created Shortly After the Notice of Default

Less than one month after receipt of the Default Letter, on August 24, 2009, defendants Berkman, Travis, and Kenneth P. Alexander ("Alexander") formed BTA to shield personal assets of Berkman from the legal claims of Lenders.  (Am. Compl., Ex. H; Declaration of Frank Heuszel ("Heuszel Decl.") attached hereto as Exhibit 1.)  Travis is not only the President of borrower Berkman Plaza and the recipient of the Default Letter, but he is also a witness to Berkman's Guaranty of

the loan and Berkman's business partner.  (Am. Compl., Exs. F & H.)  Alexander

is Berkman's accountant and business partner.  (Am. Compl., ¶ 29.)

Berkman, Travis and Alexander are all managing members of BTA and each

member is the sole manager of the assets he contributes.  (Am. Compl., Ex. H.)

However, BTA is the owner of all contributed assets, and BTA assets cannot be

distributed without the consent of all three members of BTA.  *Id.*  Specifically,

Section 7.1 of the BTA Operating Agreement requires "the unanimous vote of the

Managers and a Unanimous Vote of the Membership Interests [to] distribute Series

assets…."  (Am. Compl., Ex. H at 14.)

## D.   <u>The Transfers</u>

The BTA Operating Agreement shows that Berkman, Travis and Alexander

designed and approved the transfer of $23,000,000 of Transferred Assets from

Berkman to BTA.  (Am. Compl., Exs. A and H.)  The $23,000,000 in Transferred

Assets was transferred to BTA upon its formation on or about August 24, 2009,

less than one month after the receipt of the Default Letter.   Travis has since

admitted that he created BTA in concert with Berkman who transferred

$23,000,000 into BTA in order to shield the funds from Berkman's creditors so

that his family could receive the funds in the event of Berkman's death.  (Heuszel

Decl., Ex. 1.)

Between August 24, 2009 and January 1, 2010, Berkman also transferred to BTA interests in fifteen apartment complexes and five pieces of raw land.[3]  (Am. Compl., Exs. A and B.)

Primarily as a result of the transfer of the Transferred Assets from Berkman to BTA, Berkman's cash position decreased from $30,000,000 in 2009 to $2,000,000 in 2010, with the remaining $2,000,000 being pledged to plaintiff Compass to secure obligations on an unrelated loan.  (Am. Compl., Ex. A.)

While Berkman contributed twenty bank accounts totaling $23,000,000, Travis and Alexander contributed only one bank account each, containing unknown sums, if any.  (Am. Compl., Exs. A and H.)  Despite Berkman's disproportionate contribution to BTA, Berkman, Travis and Alexander are equal owners of BTA.  (Am. Compl., Ex. H.)

## E.    <u>The Demand for Payment</u>

As a result of Berkman Plaza's continuing events of default, on March 29, 2010, Wells Fargo notified Berkman Plaza (as borrower) and Berkman (as guarantor) that all outstanding indebtedness under the Loan Documents was due

---

[3] On July 16, 2010, BTA subsequently transferred back to Berkman 51% of its ownership in Harbor Grove Apartments, LLC, 99% of its ownership in Fairburn Apartments, LLC, 51% of its ownership in Holly Springs, LLC, and 1% of its ownership in Shallowford Pointe, L.L.C.  (Am. Compl., ¶ 11, Ex. B.)

and payable within ten days (the "Demand Letter").  (Am. Compl., Ex. G.)  By then, Berkman had no remaining liquid assets (as a result of the transfer of the Transferred Assets to BTA).  Neither Berkman Plaza nor Berkman paid the amounts owed under the Loan Documents within the ten days, nor have such amounts been paid since such time.

Subsequently, the Lenders, Berkman Plaza and Berkman negotiated over the terms of a potential forbearance agreement, but were ultimately unable to reach an agreement.  (Am. Compl., ¶ 25.)  As a result, the Lenders filed their original complaint against Berkman and BTA on July 22, 2010.  On September 17, 2010, the Lenders filed their First Amended Complaint, which, among other things, added Berkman's two business associates—Travis and Alexander—as defendants.

In April 2010, Berkman provided the Lenders with his personal financial statement which disclosed to the Lenders, for the first time, that the $23,000,000 in Transferred Assets had been transferred from Berkman to BTA on or about August 24, 2009, the date of the formation of BTA.  (Am. Compl., ¶ 26 & Ex. A.)  Prior to receipt of the personal financial statement, the Lenders had no knowledge of the transfer of the Transferred Assets to BTA.  (Declaration of Sam Boroughs ("Boroughs Decl.") attached hereto as Exhibit 2, ¶ 9.)  Thus, Berkman concealed

from the Lenders his transfer of the Transferred Assets to BTA for over eight months.

**F.      Subsequent Default and Non-payment**

On October 1, 2010, a related entity, Berkman Wynhaven Associates, L.P. ("Berkman Wynhaven"), defaulted on its loan from Wells Fargo and failed to pay the loan balance of over $7,000,000.  Berkman guaranteed the Berkman Wynhaven loan and had continuously reassured Wells Fargo of his ability to pay the note, as he has in this case, yet failed to pay the loan balance within 10 days of receipt of the demand letter dated October 7, 2010.  (Boroughs Decl., Ex. 2, ¶¶ 6-8.)

In his answer to both the Complaint and the First Amended Complaint, Berkman maintained that he, as guarantor of the Berkman Plaza loan, would be able to pay the loan balance upon "maturity" of the Promissory Notes.[4]  (Am. Compl., ¶ 83; Berkman Answer, Doc. 20, ¶ 83.)  These recent events with respect to the Berkman Wynhaven loan show that Berkman has either refused to use, or

---

[4]  The Lenders address this asserted defense merely as an inaccurate factual statement by Berkman in light of his inability to pay at maturity another loan with a lower outstanding balance.  In this case, the concept of maturity of the loan is not relevant because other, non-maturity defaults were identified in the Default Letter and the debt due under the loan has been accelerated pursuant to the Demand Letter.  In short, an asserted "defense" of being able to pay the loan balance upon what would have been the maturity date is no defense at all in the context of a defaulted, accelerated loan.

was not permitted to use, the Transferred Assets now held by BTA to make the payment upon maturity of the Berkman Wynhaven loan balance.

## G.   Berkman Failed to Pay the Loan Balance Even When He Asserted it was Due

Under any reasonable interpretation of the Loan Documents, the last date that the Loan's balance must be paid is January 16, 2011.  (Am. Compl., Ex. D, § 1.1, p. 15.)  That date has now passed, and there is no defense to payment now.

## III.   ARGUMENT & CITATION OF AUTHORITY

### A.   An Injunction Freezing Assets that are Fraudulently Transferred is Appropriate Under Georgia Law

Georgia law unequivocally states that preliminary injunctive relief is appropriate to preserve specific assets where the plaintiff has stated a claim for fraudulent transfer.[5]

Georgia's Uniform Fraudulent Transfer Act ("UFTA") provides that when a debtor makes a fraudulent transfer, Georgia's UFTA authorizes the Court to order "[a]n injunction against further disposition by the debtor or a transferee, or both, of

---

[5] A federal court sitting in diversity applies the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result.  *Tech. Coating Applicators, Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843, 844 (11th Cir. 1998).  Here, the law of Georgia, the forum state, is applicable.

the asset transferred…." *See* O.C.G.A. § 18-2-77(3)(A).[6]  Further, the Court may "enjoin [a] defendant as to transactions involving fraud…beyond the limits of this state." O.C.G.A. § 9-5-11.  Thus, this Court has authority to issue the preliminary injunction requested by the Lenders.

### B.   Standards for Granting Injunctive Relief

A United States District Court has the power to grant injunctive relief when the necessary jurisdictional criteria are met.  *See Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 69-70 (1935).  In order to be entitled to preliminary injunctive relief, the movant must demonstrate the following: (1) a substantial likelihood of ultimate success on the merits; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the threatened injury to the movant outweighs the harm the injunction would inflict on the non-movant; and (4) the injunction would serve the public interest.  *North American Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008).

Here, analysis of these factors compels issuance of the relief requested.

---

[6] Florida has also adopted the Uniform Fraudulent Transfer Act, thus, the Georgia and Florida fraudulent transfer statutes both provide for the remedy of an injunction. *See* Fla. Stat. § 726.108(c)(1).

### 1.      The Lenders Are Likely To Succeed On the Merits

The first element in determining whether a party is entitled to a preliminary injunction is whether the movant can demonstrate a substantial likelihood of ultimate success on the merits.  *See North American Med.*, 522 F.3d at 1217.

O.C.G.A. § 18-2-74(a) prohibits fraudulent transfers and provides for several options in determining whether a conveyance was a fraudulent transfer. Specifically, Section 18-2-74 states:

(a)      A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1)      With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2)      Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A)      Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction....

O.C.G.A. § 18-2-74.

Thus, a transfer can be fraudulent if there is actual intent to hinder, delay or defraud a creditor under section (a)(1) or if there is constructive intent under

section (a)(2)(A).[7] These standards, when applied to the facts of this case, show that Lenders are highly likely to meet their burden to show that the transfer of the $23,000,000 in Transferred Assets from Berkman to BTA was fraudulent.

### a.   Lenders are Substantially Likely to be Successful Under the Actual Intent Standard

Under § 18-2-74(a)(1), a transfer is fraudulent if there is actual intent to hinder, delay or defraud any creditor of the debtor.  Section 18-2-74(b) identifies certain "badges of fraud" that evidence actual intent.  The existence of several badges of fraud can "constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *See Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th Cir. 1995) (citation omitted); *see also In re Kranich*, 53 B.R. 821, 823 (Bankr. M.D. Fla. 1985) (several badges of fraud "may by their number and joint consideration be sufficient to constitute conclusive proof" of fraud (citation and quotations omitted)).

With respect to the badges of fraud, the Court must consider, among other factors, whether:

    (1)    The transfer or obligation was to an insider;

---

[7] Lenders, by focusing on sections (a)(1) and (a)(2)(A) in this memorandum, are not waiving and expressly reserve the right to assert other fraudulent transfer standards.

(2)     The debtor retained possession or control of the property transferred after the transfer;

(3)     The transfer or obligation was disclosed or concealed;

(4)     Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     The transfer was of substantially all the debtor's assets;

(6)     The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-74(b).

Here, most of the badges of fraud are present.  In fact eight of eleven badges of fraud apply directly to the facts of this case (the numbers indicated correspond to the numbers of the badges of fraud listed above):

(1)     The transfer was to a company owned, in part, by an insider (Berkman);

(2)     Berkman retained control of the property transferred after the transfer;

(3)     The transfer was concealed;

(4)     Lenders threatened Berkman with suit just prior to the transfer of the Transferred Assets to BTA;

(5)     The Transferred Assets comprised substantially all of Berkman's liquid assets;

(7)     Berkman removed and concealed assets;

(8)     The value of the consideration received by Berkman was far less than the value of the asset transferred; and

(9)     Berkman became insolvent shortly after the transfer was made.

Here, the badges of fraud "by their number and joint consideration" are "sufficient to constitute conclusive proof" that the transferring of the $23,000,000 in Transferred Assets from Berkman to BTA was a fraudulent transfer. *See In re Kranich*, 53 B.R. at 823, *supra*.

First, the Transferred Assets were transferred to an insider—BTA. O.C.G.A. § 18-2-71 provides examples of an "insider," including a "partnership in which the debtor is a general partner" and "a corporation of which the debtor is a director, officer, or person in control."   O.C.G.A.  § 18-2-71(7)(A).   These examples of "insiders" are substantially similar to the situation here as Berkman is one of the three members of BTA, which is a limited liability company.   Thus, BTA is clearly an insider.

Second, Berkman retained control of the funds transferred to BTA, with the added protection that the funds could not be transferred without the consent of all members of BTA.  (Am. Compl., Ex. H.)

Third, the transfer of the Transferred Assets from Berkman to BTA occurred in August 2009, *id.*, however, it was not revealed to Lenders until Berkman provided his personal financial statement in April 2010.  (Boroughs Decl., Ex. 9.)

Fourth, before the transfer of the Transferred Assets from Berkman to BTA occurred, Berkman was aware of the potential for a lawsuit because Lenders sent Berkman Plaza and Berkman the notice of default on July 31, 2009—less than one month before the Transferred Assets were transferred.  (Am. Compl., Ex. F.)

Fifth, the Transferred Assets comprised almost all of Berkman's assets. Substantially as a result of the transfer of the Transferred Assets, Berkman's cash decreased from $30,000,000 to $2,000,000, with the remaining $2,000,000 pledged to Compass to secure separate obligations on an unrelated loan.  (Am. Compl., Ex. A.)

Sixth, Berkman removed and concealed assets when he transformed his liquid assets from cash or the equivalent in cash into a membership in a limited liability company by transferring the Transferred Assets to BTA in August 2009. Berkman failed to inform the Lenders of the transfer for over eight months.

15

(Boroughs Decl., Ex. 2, ¶ 9.)  Thus, the seventh badge of fraud listed in O.C.G.A. § 18-2-74(b) shows that Berkman's transfer of liquid assets to BTA was made with actual intent to defraud Lenders.

Seventh, Berkman did not receive reasonably equivalent value for the Transferred Assets because he contributed almost all of the assets held by BTA in the form of $23,000,000 in cash, yet only received a one-third interest in BTA. (Am. Compl., Ex. H.)  This transfer rendered Berkman insolvent as he was left unable to pay his debts as they came due,[8] and thus badges of fraud eight and nine show that the transfer of assets was fraudulent.

Finally, in addition to the statutory factors, Travis admitted to Compass and its counsel that the formation of BTA and the subsequent transfer of the Transferred Assets were done for the purpose of shielding Berkman's assets from creditors for the benefit of his family.  (Heuszel Decl., Ex. 1.)

Thus, the statement of a member of BTA and the badges of fraud show actual intent to defraud Lenders as a matter of Georgia law.  Therefore, Lenders have a substantial likelihood of success on their fraudulent transfer claim.

---

[8] For example, the Berkman Wynhaven loan matured on October 1, 2010. Berkman guaranteed that loan.  Despite being served with a demand for payment of the outstanding balance, Berkman has not paid the loan balance (or any portion thereof).

### b. Lenders are Substantially Likely to Prevail Under the Constructive Intent Standard

Under § 18-2-74(a)(2), constructive intent to defraud is found where the debtor made a transfer:

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction....

O.C.G.A. § 18-2-74(a)(2).

"In order to determine whether a debtor received 'reasonably equivalent value,' the court must look at what 'value' the debtor received in return for the transfer." *Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (N.D. Ga. 2009).

"The term 'unreasonably small capital' denotes a financial condition short of insolvency, and the 'unreasonably small capital' test of financial condition is aimed at transferees that leave the transferor technically solvent but doomed to fail." *Id.* at 836 (citation omitted). "In order to determine whether a debtor is operating with inadequate capital, a court must look at the debtor's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." *Id.*

In *Interest Mortgage Investment Company v. Skidmore*, 655 F. Supp.2d 1100, 1107 (N.D. Cal. 2009), the debtor, like Berkman, "was engaged in the business of construction and real estate development, and in particular, of guaranteeing construction loans."   Under the applicable state's version of the Uniform Fraudulent Transfer Act, the court analyzed whether, following a transfer of property, the remaining assets left the debtors reasonably able to pay obligations that they should have expected to arise from their business.  *Id.*

First, the court found that the debtors should have been put on notice that they must pay their $4,750,000 guaranty after a lien on the project was recorded, the project's primary contractor lost its license and various fees in connection with the project had not been paid.  *Id.* at 1108.  Moreover, the debtors had guaranteed at least three other similar loans for which the lender had filed suit seeking payment.  *Id.*

Next, the court compared the debtors' obligations to their assets.  *Id.* at 1108. At the time of the transfer, the debtors had guarantied loans worth $22,700,000. *Id.*   After the transfer, the debtors had "assets," as defined under the Uniform Fraudulent Transfer Act, of $15,600,000.   *Id.* at 1109.   The court, granting summary judgment, found that assets of $15,600,000 were not reasonable in the face of loan guaranties of $22,700,000.  *Id.*  The court reasoned that the assets must

18

be available because guaranties are not the type of obligation that debtors could justifiably expect to satisfy over a period of time with their future earnings they are a "contingent promise to immediately pay an obligation in full." *Id.*

Here, the facts surrounding the transfer of the Transferred Assets from Berkman to BTA are substantially the same as those analyzed in *Intervest*. First, the transfer of the Transferred Assets was not for reasonably equivalent value. Berkman did not receive "reasonably equivalent value" because he transferred $23,000,000 in cash to BTA yet only received a one-third interest in BTA.[9] (Am. Compl., Ex. H.) The interest received from BTA is further devalued because it is not a liquid asset and the BTA Operating Agreement requires the unanimous consent of all members to distribute assets. (Am. Compl., Ex. H.)

The transfer of the Transferred Assets left Berkman with assets unreasonably small ($2 million in cash pledged as collateral to Compass on an unrelated loan) in relation to the remaining obligations under the loan transaction (more than $14 million). His remaining assets are far less than the $15 million liquidity requirement under the Loan Documents and far less than the ratio of assets to liabilities that the *Intervest* court deemed insufficient. Moreover,

---

9 Upon information and belief, the other two members—Travis and Alexander—contributed little or no cash in exchange for each of their one-third member interests in BTA.

Berkman was on notice that he may have to pay on his guaranty at the time he transferred the Transferred Assets to BTA. Further, on July 31, 2009, less than one month before the Transferred Assets were transferred from Berkman to BTA, Wells Fargo sent Berkman a letter explaining that events of default existed under the Loan Documents and the loan commitments were thereby terminated. (Am. Compl., Ex. F.) Thus, it is undisputable that Berkman was aware that he may have to pay on the Guaranty.

Finally, the transfer of the Transferred Assets to BTA left Berkman with unreasonably small assets compared to the amount of the Guaranty. At the time of the transfer of the Transferred Assets, Berkman's guaranty obligations under the Berkman Plaza loan exceeded $14 million. As discussed in *Intervest*, Berkman's other guaranty obligations must be considered. 655 F. Supp.2d at 1108. Berkman is also the guarantor of other loans to Wells Fargo. One of those loans—the Berkman Wynhaven loan—has matured and Wells Fargo has demanded payment exceeding $7 million. (Boroughs Decl., Ex. 2, ¶¶ 3-8.) Also, Berkman has at least $200,000,000 in guaranty liability with respect to other loans owed to Wells Fargo and Compass. (Am. Compl., Ex. A.) To date, Berkman has failed to meet his payment obligations on that loan even though he apparently still has sufficient assets in BTA.

Berkman's guaranty obligations far exceed his assets after the transfer of the $23,000,000 in Transferred Assets left Berkman with only $2,000,000 in cash. (Am. Compl., Ex. A.)   This cash, however, was already pledged to Compass to secure separate obligations and cannot be considered an "asset" as defined by the Uniform Fraudulent Transfer Act.   *See Intervest*, 655 F. Supp.2d at 1106; O.C.G.A. § 18-2-71(2).   Section 18-2-71(2) specifically provides that "asset" does not include property of the debtor that is "encumbered by a valid lien."   Thus, after the transfer of the Transferred Assets to BTA, Berkman had zero liquid cash assets, despite his obligations to maintain $15,000,000 in liquid assets.

Berkman did not receive reasonably equivalent value for the Transferred Assets.   Moreover, the transfer of the Transferred Assets left Berkman doomed to fail on his guaranty obligations.   Thus, Lenders have a substantial likelihood of success on their fraudulent transfer claim based on constructive fraud.

**2.    The Lenders Will Suffer Irreparable Harm
          Absent Injunctive Relief**

If the requested injunctive relief is not granted, the Lenders will suffer irreparable harm because the transferred funds may be transferred to a third party against whom Lenders may not recover.   "[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974).   An injury is irreparable if it cannot

be undone through monetary remedies. *Id.* In this case, the lack of a monetary remedy is the very danger the Lenders face.

BTA's funds, and thus Berkman's funds after avoidance, will likely be dissipated before the conclusion of this case unless injunctive relief is granted. If the funds are dissipated, then the Lenders' legal remedies will prove meaningless because no funds will remain when the Lenders seek to enforce their judgment. The preservation of the status quo with respect to the Transferred Assets is a proper use of the Court's equitable powers. *See ITT Community Development Corp. v. Barton*, 457 F. Supp. 224 (M. D. Fla. 1978); *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) ("preliminary injunctions are proper to prevent a defendant from making a judgment uncollectable"); and *Gelfand v. Stone*, 727 F. Supp. 98, 101-102 (S.D.N.Y. 1989) (granting a preliminary injunction to preserve defendant's assets where plaintiff's success on the merits would otherwise be unenforceable).

The primary purpose of a fraudulent transfer action is to undo the transfer and to restore the parties to their pre-transfer positions. The Plaintiffs' request to avoid the transfer as fraudulent – a form of rescission – is an equitable remedy. "[T]o be able to void [unlawful] transfers of assets…requires that those assets be preserved." *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489,

498 (4th Cir. 1999).  Preliminary injunctive relief is thus proper here to preserve the Transferred Assets until a decision on the merits can be made.

Considering that Berkman formed BTA and transferred his assets to BTA immediately after he received the Default Letter, there is a high probability that BTA, which is controlled by Berkman and his associates, will take additional steps to transfer the assets to further frustrate the Lenders' ability to recover.

Given the nature of the Transferred Assets – cash or cash equivalents – it will be very difficult to trace and recover the Transferred Assets once they are further transferred by BTA.  Moreover, if BTA transfers the Transferred Assets to "a good faith transferee or obligee who took for value or from any subsequent transferee or obligee," the Georgia UFTA will not protect the Lenders.  O.C.G.A. § 18-2-78(b)(2).

Berkman has no liquid assets remaining.  Berkman's financial statements show that his cash position decreased from $30,000,000 in 2009 to $2,000,000 in 2010.  Berkman then pledged the remaining $2,000,000 to secure separate obligations to Compass on an unrelated loan.  In October 2010, Berkman failed to fulfill his obligations as guarantor of a separate loan by Wells Fargo to Berkman Wynhaven, thereby demonstrating his inability to fulfill his obligations as guarantor of the loan to Berkman Plaza.  If the Lenders ultimately obtain a

23

judgment against Berkman on the Guaranty and the Transferred Assets are not preserved, the Lenders will have nothing but a worthless judgment, causing them irreparable harm.

### 3.    The Balance of the Harms Favors the Lenders

Berkman transferred the assets to BTA to put them out of the Lenders' reach.  Thus, any hardship that Berkman and BTA claim as a result of the injunction is attributable to their own wrongdoing and should be afforded minimal, if any, weight.

On the other hand, there is an immense hardship to the Lenders.  Any further transfer by BTA may not be easily unwound, especially since the Transferred Assets are cash and further transfer to a bona fide third party purchaser does not come within the protection of the Georgia UFTA.  An injunction will also serve to ensure that no further parties must be joined to this action, avoiding unnecessary litigation.

The Lenders are merely requesting that the Court maintain the status quo. Thus any harm that will inure to the Lenders by further transfers is far greater than any harm to Berkman or BTA if future transfers of the Transferred Assets are enjoined.  Given these facts, the balance of harms tips strongly in favor of the Lenders and, accordingly, the requested injunctive relief should be granted.

**4.      Prevention of Harm Caused by Fraudulent Transfers
             Serves the Public Interest**

The Georgia legislature has already resolved this issue against Berkman and BTA.  The legislature clearly stated that the public interest would be served by prohibiting debtors and transferees like Berkman and BTA from further disposing of fraudulently transferred assets when it enacted O.C.G.A. § 18-2-77(a)(3).

The public has an interest in seeing that parties that enter into commercial agreements honor those agreements and be held accountable when they fraudulently seek to evade their contractual obligations.  *See, e.g,* O.C.G.A. § 18-2-77, *et seq*.  In this case, the claims against Berkman arise out of his breach of his Guaranty of Berkman Plaza's loan with the Lenders and additional claims against Berkman and BTA stem out of their attempt to shield Berkman's assets from the Lenders.  The public has an interest in seeing that Berkman and BTA do not succeed in their attempts to evade Berkman's contractual obligations. Accordingly, the public interest favors the granting of a preliminary injunction.

## IV.  CONCLUSION

For the reasons set forth in the Motion and this memorandum in support thereof, Lenders respectfully request that this Court grant its motion for a

preliminary injunction enjoining any Defendant from further transferring or otherwise disposing of the Transferred Assets.

Respectfully submitted this 28th day of January, 2011.

McGuireWoods LLP

/s/ David J. Forestner
David J. Forestner
Georgia Bar No. 269177
C. Jordan Myers
Georgia Bar No. 201008
Suite 2100, The Proscenium
1170 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: 404-443-5500
Telecopier: 404-443-5599
dforestner@mcguirewoods.com
jmeyers@mcguirewoods.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE AND</u>
## <u>COMPLIANCE WITH LOCAL RULE 5.1</u>

I hereby certify that a true and correct copy of the above and foregoing was

served via electronic filing (CM/ECF) on this 28th day of January, 2011, with an

automatic copy being routed to the following:

Richard L. Robbins
richard.robbins@robbinsfreed.com

Jeremy U. Littlefield
jeremy.littlefield@robbinslaw.com

I further certify that in compliance with LR 5.1 the above and foregoing has

been prepared using 14-point Times New Roman font.

<u>/s/ David J. Forestner</u>
David J. Forestner
Georgia Bar No. 269177

McGuireWoods LLP
Suite 2100, The Proscenium
1170 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: 404-443-5500
Telecopier: 404-443-5599
dforestner@mcguirewoods.com
jmeyers@mcguirewoods.com

*Counsel for Plaintiffs*

\27699847.7